## Matthews' Appeal.

1. The relation of landlord and tenant is a confidential relation, so far as to render it inequitable for a tenant, who is also a lien creditor, to issue execution and buy the property in at sheriff's sale without notice to his landlord.

2. A., the assignee of a bond, secured by a purchase money mortgage of certain premises, took a lease thereof from B., the terre-tenant, who had purchased subject to the mortgage. A. immediately afterwards began suit upon the bond, and, having obtained judgment against the obligor therein, issued execution, without notice to B., his landlord, of any of these proceedings. Under this execution the land was sold at sheriff's sale to C., a trustee for A.; and C. brought ejectment against B. to recover possession of the land. Shortly before this sale, B. made an arrangement with D., who held a prior mortgage on the land, on which judgment had been obtained, to issue execution, in B.'s interest, and make title to him by sheriff's sale. This execution being stayed on a plea of payment of the mortgage, B. filed a bill against A. and C. to set aside the sheriff's deed to the latter:

 *Held:* that the rule that a terre-tenant cannot combine with a prior lien-holder to relieve his land from a just debt, did not apply here, where, as a matter of fact, B. and D. had no intention to defraud A., and consequently, that B., who, as A.'s landlord, was entitled to notice of the sheriff's sale under which C. took title, was not precluded from attacking C.'s title.

3. The appellant's paper book contained the following criticisms upon the report of the Master in the court below: "Such reasoning is contrary to common sense." "It is kin to the utterings of a crank." "a ruling which more closely resembles the utterings of a crank than the reasoning of a chancellor." *Held:* that this language was scandalous, especially as the report had been confirmed by the court below; and the paper book was accordingly suppressed under Rule XXXI, which provides that "on a proper occasion, the court will, of its own motion, . . . suppress the paper book." But afterwards the paper book having been purged, argument of the case was heard by consent of the opposite counsel.

October 30th 1883. Before MERCUR, C. J., GORDON, PAXSON, STERRETT, GREEN and CLARK, JJ. TRUNKEY, J., absent.

 APPEAL from the Court of Common Pleas No. 2 of *Allegheny county:* Of October Term 1883, No. 91.

 Bill in equity, by the Pittsburgh and Castle Shannon Railroad Company against John Matthews, Agnes Matthews, Robert

[Matthews' Appeal.]

Matthews, and William B. Matthews, to set aside a sheriff's sale and sheriff's deed whereby the defendants took title to a tract of land in Snowden township, Allegheny county. After an answer had been filed, the case was referred to James M. Stoner, Esq., as examiner and master to take testimony, find the facts and report a form of decree. The master reported the facts to be as follows:

Upon November 28th 1871 John Matthews, the defendant, was the owner of the tract of land in controversy, containing some one hundred and forty-five acres. On that date he conveyed the same to William C. Aughinbaugh for $21,853.12 subject to a prior purchase money mortgage given by Matthews to John Gallagher on which a judgment had been obtained for $10,390.50. Aughinbaugh was a stockholder in the Pittsburgh & Castle Shannon Railroad, and this conveyance was intended to be for the benefit of the road, which at that time had not the corporate power to hold it. In February 1872 their charter was amended and Aughinbaugh conveyed to them. The sale was made to Aughinbaugh under the agreement that he should pay off the Gallagher mortgage and give a purchase money mortgage for the balance of the consideration. Gallagher, however, did not satisfy his mortgage, but assigned it to M. D. Hays, and he in turn assigned it to Jacob Hays, who advanced the money to pay it, in order that he might hold it for his own security. This was done without the knowledge or consent of the defendants. Aughinbaugh executed a mortgage of the land to Matthews for $11,462.62 securing his five bonds, three for $2,000 each and two for $2,731.31 each. Aughinbaugh protected himself by taking an indemnifying bond from the Pittsburgh & Castle Shannon Railroad in the sum of $80,000 when he conveyed to the company. When the deed was made by Matthews to Aughinbaugh the railroad company entered into possession of the land and ever since remained in possession thereof by themselves or their tenants.

Matthews assigned the bonds given him by Aughinbaugh to various parties, and from time to time part payments were made upon them by the Pittsburgh & Castle Shannon Railroad. On February 28th 1878 a scire facias was issued upon the mortgage accompanying them by one Lutz, an assignee, in the name of John Matthews to use of John Matthews, Jr., Agnes Matthews, Daniel Lutz and Wm. McIntyre, with notice to the Pittsburgh & Castle Shannon Railroad, terre-tenants, on whom the writ was served. Judgment was obtained for want of an affidavit of defence and execution issued, which was stayed in March 1878. At that time the only bond which had not been paid in full was that for $2,731.31 assigned to Agnes Matthews, and upon this sundry partial payments had been made. About

March 7th 1878 a lease of the land in controversy was executed and delivered by the plaintiffs to the defendants, Mrs. Agnes Matthews and Robert Matthews, and occupied by them for a term of one year from April 1st 1878, at the annual rent of $300 per annum, payable November 28th 1878 with covenants that the rent until paid should be set off against a bond or bonds held by Mrs. Matthews against the plaintiff, and that in case the tenants held over the contract should continue in full force for another year, and so on from year to year until legal notice was given for removal. Near or about the time when this lease was executed, Mrs. Matthews stated to M. D. Hays, with whom, as president of the plaintiff company, she negotiated the lease, that "she would let the rents stand on her payments." And on the 1st day of April 1878, she entered·into possession of the property pursuant to the lease, and has since remained on it.

Upon April 4th 1878 Agnes Matthews, after previous threats, began suit against Aughinbaugh upon the bond assigned to her by Matthews, and obtained judgment by default, for $2,370.92. In computing this amount no credit was allowed for amounts actually paid on account. A fi. fa. having been returned nulla bona, the property in question was levied upon and condemned. No notice was given to the plaintiffs of the inquisition, but Aughinbaugh had notice. Upon a vend. ex. issued to January Term 1880, the property was sold by the sheriff to William Blake Matthews, the defendant, for $1,800, there being some competition by unknown parties. Upon September 27th 1880 the sheriff's deed was delivered to W. B. Matthews who took title in trust for his mother,. Agnes Matthews, in pursuance of a written agreement made by them on September 14th 1879 as follows:

"1. Blake Matthews to execute a declaration of trust that he bought at sheriff's sale and holds sheriff's title in trust for his mother, Agnes Matthews.

"2. Blake to assume and perform the work necessary to vindicate that title, including the employment .of counsel on contingent contract for fees.

"3. In consideration of which Blake Matthews to have one-fifth of the net profits, after deducting attorney's fees and costs.

"4. It is further agreed that Blake shall pay his mother, Agnes Matthews, $300 per year, she to have that part of the house to live in that she may select, and the privilege of keeping one cow and one horse on the farm. All rent to begin on the 1st of April 1880, and to continue until the title to the property is settled.

"Blake to pay taxes and have credit on the yearly rental of

$300 during the time of this lease, Blake to get a further credit of $30 on account of rent heretofore paid."

There appeared to have been a verbal understanding between them as early as April 1st 1878 that W. B. Matthews was " to look after her interests at the sheriff's sale."

Upon November 13th 1880, W. B. Matthews brought an ejectment against the plaintiffs to recover possession of the land, which is still pending.

In the meantime upon August 13th 1880, a pluries levari facias was issued upon the judgment obtained upon the Gallagher mortgage, by John Gallagher to the use of Jacob Hays' heirs, who were acting in the interests of the Pittsburgh and Castle Shannon Railroad, by an agreement dated July 8th 1880, under which they were to acquire title at sheriff's sale and convey the same to the plaintiff corporation. This execution was stayed by the court upon the application of Agnes Matthews, who averred that the mortgage had been paid by a credit on the purchase money.

On the 24th day of April 1879, by proceedings in the district court of the United States for the Western District of Pennsylvania, W. W. Martin was appointed receiver of the property and effects of the plaintiff and was discharged on the 10th day of April 1880. During the receivership the defendants, Mrs. Agnes Matthews and Robert Matthews, were in the actual possession of the land in controversy, having entered previously as tenants of the plaintiffs. Rent was demanded of them by the receiver, but of course was not paid, because by the terms of the lease it was to be applied on the Aughinbaugh bond, held by Mrs. Matthews. It does not appear that they disputed the receiver's title.

The most important question of fact in dispute was whether the plaintiff had, as claimed by the defendants, actual knowledge of the proceedings under which the land was sold to W. B. Matthews. As to this the evidence was voluminous and conflicting, and the master reported as follows :

" The proof of this depends principally upon the testimony of Mr. Aughinbaugh, who states that he went to the office of the plaintiff, both before and after the bringing of the suit, called their attention to it and asked them to defend it ; and he believes, from his habit of business, that he took the writ of summons to the president and secretary of the company. If Mr. Aughinbaugh is not mistaken, the plaintiff had notice. The circumstances, however, are such that he might readily be mistaken. Not a great while before, five suits had been brought against Mr. Aughinbaugh, one suit on each of the five bonds, the last to the use of Daniel Lutz and Mrs. Matthews.

" A further suit had also been brought on the mortgage,

making six altogether that preceeded the one in which the land in controversy was sold. These would certainly constrain him to go to the plaintiff's office and demand the satisfaction of the claims; and as they were the first brought he would be more likely to speak of himself as being under the ' lash of the law just as he supposed,' than if he had already been sued six times before on the same securities. And it is certainly worthy of remark that he nowhere in his testimony says that he called attention to the fact that he had already been served with six writs founded on this claim. He had given his obligations for various other purchases made by the plaintiffs, and it seems suit had been brought on most or all of them. He felt keenly the injury done to his credit, and evidently was, as he says, much annoyed. And it would not be strange if his memory was a little at fault as to what he did in each particular instance. He testifies that his remonstrances were to M. B. Hays, the president, and to Josiah Reamer, whom he supposed to be the secretary. They both deny any recollection of them, and Mr. Reamer says he was not then secretary and not likely to be in company's office; and, if there, only casually, and not in any official connection. W. W. Martin, secretary and receiver of the company, Ed. Reamer and Josiah Reamer, secretaries, M. B. Hays, John Adams and J. H. Ortman, successive presidents, and John Jahn, director prior to April 1880, and since then secretary and treasurer, all deny any knowledge of the proceedings until informed of them by their counsel after the delivery of the sheriff's deed. It is true that Captain Martin (and perhaps some of the others) speak only to their recollection, and do not flatly deny the statement of Mr. Aughinbaugh. But if they are to be treated as candid and credible witnesses, this is not enough to warrant the master in attaching no importance to their testimony. In view of their relation to the company and of the divestiture of its title by the suit of Mrs. Matthews, they should remember quite well any information they received respecting the proceedings. The presumption that Mr. Aughinbaugh's visits referred to the previous suits, receives perhaps a little confirmation from the fact that on one occasion Mr. Gerhard was with him; and he was only interested in the suit on the mortgage, having been served as a terre-tenant. Moreover, the company had a defense to the suit of Mrs. Matthews, growing out of the notice given by her husband not to pay the bond. The officers not only knew of this notice, but had acted on it by requiring the husband's consent to some subsequent payments. Captain Martin had been appointed receiver by the United States court, had retained counsel, and had been advised by them that no suits could be carried on against the company without leave of the .

court. He testifies that he took all papers or process served on him immediately to his counsel. The levy on the land was made during the receivership, and was a manifest contempt of court."

The master therefore found that the plaintiff had not received notice of the inquisition and sale of the land, and further reported as follows : " Whether these parties did or did not meditate fraud, [the master thinks there was such a relation of confidence between them and the plaintiffs as forbade the steps which they took for the divestiture of the plaintiffs title to the land in controversy and the purchase of it by them.] The case of McHenry's Appeal, 12 P. F. Smith 432, is in point. . . . In the present case there was not only a lease on which rent was accruing and judgment for more than was due, but there was an intimation that the creditor did not want her money, which makes the provision in the lease for the gradual payment of Mrs. Matthews' claim very significant. The plaintiffs were warranted in believing that the differences between them and Mrs. Matthews had been accommodated, and that there was to be a suspension of hostilities. To bring suit within four or five days after taking possession under this lease was, in the master's judgment, a breach of this confidence, and the subsequent divestiture of the plaintiff's title without notice to them operated as a fraud. It is, however, charged by the defendants that the plaintiffs are not entitled to relief, because they do not come into court with clean hands ; that notwithstanding the fact that they knew the Gallagher mortgage was in law and equity paid, and they had no right to keep it on foot as against the defendants, they nevertheless promoted proceedings on it for the purpose of divesting the lien of the Aughinbaugh mortgage, and thereby defrauding Mrs. Matthews. [If the plaintiffs were guilty as charged, the master does not think it would justify such a reprisal. But whatever may have been the purpose of the agreement between the plaintiffs and the Hays estate, the master does not think it contemplated the defeat of Mrs. Matthews' claim. There was so little left of it that the game was not worth the candle ;] and, moreover, the attempt could not have succeeded, because the divestiture of the lien would not destroy the debt."

The master therefore recommended the following decree :

" That the defendant, William Blake Matthews, be declared a trustee of the legal title to the land in controversy, being the land described in the first paragraph of the plaintiff's bill, for the sole use, benefit and behoof of the plaintiffs, and upon the payment by the plaintiffs to the defendant, Agnes Matthews, of the amount of the judgment No. 22, July Term 1878, debt, interest and costs, the said defendants, William Blake Matthews and Agnes Matthews, shall convey the property aforesaid to the

8 OUTERBRIDGE.—29

plaintiffs, by a good and sufficient deed in fee simple ; that the defendants, Agnes Matthews and William Blake Matthews, pay the costs of this suit, and that the bill be dismissed as to the other. defendants."

Exceptions filed by the defendants to this report were dismissed by the court (no opinion filed), and the above decree was entered as the decree of the court. The defendants then took this appeal, assigning for error, inter alia, those portions of the master's report inclosed in brackets and also that :

1. The court erred in not finding that the answer of defendants was responsive to the bill, and expressly denied the averment of want of notice to the company and the allegations of fraud, and that there was not sufficient proof on part of complainant to overturn the answer.

2. The court erred in not finding that the bonds given by Aughinbaugh for the balance of purchase money were obligations upon which he was personally and individually liable, and that Agnes Matthews, the assignee and holder of one of them, upon the neglect or refusal of Aughinbaugh or the company to pay, had the legal right to sue Aughinbaugh on the bond, prosecute her suit to judgment, execution, seizure and sale of the land in dispute to compel payment. That she was not legally bound to look beyond Aughinbaugh, and that notice to him was notice to the company.

3. The court erred in not finding that the agreement between the complainant and the Hays heirs of July 8th 1880, was collusive, and that the subsequent attempt in pursuance thereof by the complainant to force the land to sheriff's sale, under the false pretence of it being done by the Hays heirs, and for their use, and at the same time neglecting and refusing to pay Mrs. Matthews, were a fraud in law upon her rights, and a forfeiture of any equity the plaintiff may have had to sustain this bill.

When the case was called for argument upon October 29th 1883, the appellees' counsel directed the attention of the court to the following language in the appellants' paper book used in reference to the master's report:

"Such a course of reasoning is contrary to common sense. Its fallacy is too plain to provoke criticism. It is kin to the utterings of a 'crank.' " . . . . "But, the master bridged it over by saying that there was so little of the balance of purchase money left that the game would not be worth the candle. And therefore, excused the company from fault. Here, again, we have a ruling which more closely resembles the utterings of a 'crank' than it does the reasoning of a chancellor."

The court took the matter under consideration, and upon the opening of court upon the day following, Mercur, C. J., stated their opinion substantially as follows:

[Matthews' Appeal.].

" Our attention has been directed to some objectionable and improper language in the appellants' paper book. Objectionable words, hastily spoken in the warmth of oral argument, may often be excused. In printed arguments there is no excuse for language such as we find in this book. The motives of the master are impugned and he himself is spoken of contemptuously. Especially is this unjustifiable, where, as here, the master's report was confirmed by the court. The master is a part of the court. To say that his course of reasoning is contrary to common sense and kin to the utterings of a crank, is not criticism on his reasoning nor relevant to the questions at issue. A majority of this court has determined that this paper book be suppressed."

COUNSEL for appellant desired to be heard.

MERCUR, C. J. We have read the language and decided on its impropriety. We cannot hear argument as to the wisdom of our decision, but if you wish to make any apology we will hear you.

COUNSEL for appellant then stated that the argument was written in haste, and was not intended to reflect personally upon the Master, between whom and the counsel friendly relations existed ; and that the objectionable language would be expunged.

This was done, and the case was then, by the consent of appellees' counsel, heard by the court.

*H. W. Weir* (with whom was *H. G. Crawford*), for appellants.—The answer, being responsive to the bill and denying the averment of want of notice, can only be overturned by the testimony of two witnesses, or of one witness and corroborating facts: Slemmer's Appeal, 8 P. F. S. 155 ; Horton's Appeal, 1 Harris 67 ; Eaton's Appeal, 16 P. F. S. 483 ; Peacock *v.* Chambers, 3 Grant 398 ; Pusey *v.* Wright, 7 Casey 387. The evidence showed fraud and collusion on the part of the plaintiffs, in order to divest defendants' lien. The owner of land cannot make use of a prior incumbrance to discharge his land from a just debt: Schoening *v.* Speck, 8 W. N. C. 44. He who comes into equity must come with clean hands: Hershey *v.* Weiting, 14 Wright 244 ; Lewis' Appeal, 17 P. F. S. 153 ; Rankin *v.* Simpson, 7 Harris 471 ; Bleakley's Appeal, 16 P. F. S. 190.

*S. Schoyer, Jr.,* and *D. T. Watson* (with whom was *W. R. Errett*), for appellees.—The plaintiffs and defendants were in a confidential relation to each other—that of landlord and tenant—so that the failure of the latter to give notice of their adversary proceedings amounted to fraud: Story Eq. §§ 218, 323 ; Darlington's Appeal, 5 Norris 518. The report of a Mas-

ter, approved by the court below, as a general rule will not be set aside by the Supreme Court : Sproull's Appeal, 21 P. F. S. 137 ; this is so even if the merits may appear contrary to his findings, in case of conflicting testimony, as the credit to be given to witnesses depends much on their appearance and conduct.

The opinion of the court was delivered January 7th 1884, by Mr. Justice PAXSON.

But for the relation of landlord and tenant, which existed between the defendants below (appellants), and the plaintiffs (appellees), the legal proceedings by which the former acquired the title to the real estate in controversy, could not be success-fully assailed. The said proceedings were regular upon their face and sufficient to pass the title. But the Master and the court below held, and we think correctly, that when the appel-lants entered into possession of the property as the tenants of the appellees under the lease, that a relation of trust and confi-dence was thereby established between them, which rendered it inequitable in the appellants to combine for the purpose of obtaining the title from the appellees by a judicial sale or other-wise, without notice to them. That such combination was formed and carried out is found by the Master, and is sustained by the evidence. Within a few days after the lease was signed, and the appellants had entered into the possession of the demised premises, the latter commenced their suit against Mr. Aughinbaugh. This they had a right to do notwithstand-ing the lease, and perhaps without notice to the appellees. But when they proceeded to sell the property, knowing it to be the property of the appellees, and without notice to them, the case is widely different. It would have been a breach of faith to have allowed the property to be sold by the sheriff by any one, without notifying the landlord ; much more so to pro-cure such a sale upon their own judgment. Moreover, it clearly appears that the object of their proceeding was to divest the landlord's title, not to make the money due Mrs. Matthews. No other construction can be placed upon the agreement made between the appellants months before the sheriff's sale, by which Blake Matthews was to execute a declaration of trust that "he bought at sheriff's sale, and holds sheriff's title in trust for his mother, Agnes Matthews ;" 2d. That Blake should "assume and perform the work necessary to vindicate that title, including the employment of counsel on contingent con-tract for fees ;" and, 3d. That, in consideration of the foregoing, Blake was to receive "one-fifth of the net profits, after deduct-ing attorney's fees and costs." No argument is needed to show that this looked only to a sale of the property, not to the col-

lection of the inconsiderable sum remaining due Mrs. Matthews from the appellees. And why should the appellants suppose the property would be knocked down at a sheriff's sale for the low price of the appellant's judgment, unless the fact of such sale was withheld from the appellees? The property was worth many times the amount of Mrs. Matthews' judgment; in fact, the appellees had recently paid off several thousand dollars of the liens against it. It is not reasonable to suppose that the appellants could have imagined that the appellees would permit the property to be sold for so inconsiderable a sum, if they had knowledge of the sale. The Master has found the fact that they had no notice of these proceedings, and while there is a conflict of evidence upon this point, the court below declined to reverse the Master's finding, and we cannot see our way clear to do so. Said finding is strengthened by the fact that the agreement referred to evidently points to a sale of which the appellees should be ignorant. Nor do we see any force in the position that the evidence upon the question of notice was insufficient to overcome the averment of notice in the answer. Several witnesses were examined upon this point; there was enough, if believed, to overcome the answer, and we are not prepared to say the Master erred in this particular.

It is also to be observed that the provision in the lease to Mrs. Matthews by which the rent was to be credited upon her claim was well calculated to throw the appellees off their guard. The Master very properly says: "The plaintiffs were warranted in believing that the differences between them and Mrs. Matthews had been accommodated, and that there was to be a suspension of hostilities. To bring suit within four or five days after taking possession under this lease was, in the Master's judgment, a breach of this confidence, and the subsequent divestiture of the plaintiffs' title without notice to them operated as a fraud."

It was strongly urged that the plaintiffs below did not come into court with clean hands, and their attempt to enforce the Gallagher mortgage was referred to as evidence of this fact. But the master has found that this was not done with any intention to divest or destroy Mrs. Matthews' claim. I have examined the evidence upon this point with some care and am of opinion that the Master's finding was justified. This strips this transaction of the garb of fraud, and as no wrong was intended to Mrs. Matthews, it can hardly be held to justify her subsequent conduct.

Were we to permit a tenant to destroy his landlord's title in this manner we would introduce a principle into our law which could only result in evil, and that continually. The decree does no wrong to the appellants. It places the title back where it

properly belongs, but only upon condition of the payment of Mrs. Matthews' claim.

The decree is affirmed, and the appeal dismissed at the costs of the appellants.