No. 29,892.

G. D. ROBINSON, C. F. ROBINSON, T. L. ROBINSON and C. A. BECK, *Appellants*, v. THE EAGLE-PICHER LEAD COMPANY and THE COMMONWEALTH LEAD AND ZINC COMPANY, *Appellees*.

(297 Pac. 697.)

Opinion filed April 11, 1931.

*E. B. Morgan,* of Galena, *L. A. Wetzel,* of Miami, Okla., *T. J. Madden, Harry R. Freeman, John G. Madden* and *James E. Burke,* all of Kansas City, Mo., for the appellants.

*F. W. Boss,* of Columbus, for the appellees.

The opinion of the court was delivered by

HUTCHISON, J.: This is an appeal by the plaintiffs from a judgment of the trial court in favor of the defendants in an action brought to obtain a decree in equity imposing a trust upon a certain mining lease taken in the name of one of the defendants, which it is claimed should be for the use and benefit of the plaintiffs. There are four plaintiffs who claim to be interested, but all the transactions involved were with and in the name of one only of them, G. D. Robinson.

The case involves the question of the right of the sublessor to continue to receive his royalties during the renewal or extension period of a mining lease procured by his sublessees directly from the landowner.

The plaintiffs allege they were possessed of an expectancy of renewal constituting a vested property right in the mining lease, that the defendants as sublessees occupied a fiduciary relationship to the plaintiffs as tenants and owed a duty to plaintiffs to render every service to the plaintiffs imposed by the terms of the sublease and to conduct the mining operations in a manner to bring to the plaintiffs the greatest revenue possible, and to furnish the plaintiffs with full information in their possession as to the mine, the discoveries and development, and not to withhold from plaintiffs nor keep secret from them any steps or movements inconsistent with the best interests of the plaintiffs. Plaintiffs further allege that defendants, sublessees, have violated the terms of their agreement by ceasing to operate the mine as required by the terms of the lease, that they have withheld and kept secret from the plaintiffs the drill logs, assays and blue prints of the underground workings, the extent of the ore bodies discovered, and that defendants have secretly and surreptitiously negotiated for and obtained a renewal lease from the landowner for the purpose of destroying the right of expectancy of renewal in the plaintiffs; that because of such fiduciary relationship the plaintiffs are in equity entitled to the use and benefit of such renewal lease so procured by the defendants.

The defendants in their answer denied generally the allegations of the petition and specifically denied there was any confidential or fiduciary relationship existing between plaintiffs and defendants, denied that they secretly obtained the lease and denied that the plaintiffs have any right to or interest in the lease in law or in equity.

The evidence showed that on April 18, 1917, one A. L. Wilbur, the owner of a tract of land in Cherokee county, Kansas, upon which the lead and zinc ore mine in question was located, executed and delivered a mining lease on the same to one of the plaintiffs, G. D. Robinson, for fifteen years, expiring April 18, 1932. On April 19, 1917, Robinson executed and delivered to W. J. Klingenberg, trustee, a mining sublease on the same land for a period beginning on that date and expiring April 17, 1932, one day earlier than the expiration of the original lease. On June 28, 1917, Klingenberg,

trustee, made an absolute assignment of his lease to the defendant Commonwealth Lead and Zinc Company, retaining no interest.

On September 24, 1918, the Commonwealth Lead and Zinc Company, through one O. S. Picher, entered into a contract with the Eagle-Picher Lead Company, granting the right to mine the land and sell the ores therefrom for a period ending April 17, 1932, pursuant to and under the provisions, covenants, terms and conditions of the mining lease executed by Robinson to Klingenberg, trustee. The contract further recited that Robinson held his right in the premises by virtue of a lease from A. L. Wilbur and that the contract was made subject to all the terms and conditions of both leases, which were made a part of the contract, and that second party agreed to do all things necessary to be done by virtue of said prior leases. The contract contained a provision that both parties, the Commonwealth Lead and Zinc Company and the Eagle-Picher Lead Company, should use their best efforts to secure a mining lease on said premises for an additional period. Thereafter the Eagle-Picher Lead Company went into possession of the premises under the sublease and has since remained in possession of the premises, conducting mining operations thereon and accounting for and paying over to the plaintiffs the royalties provided for in the sublease.

On April 28, 1929, the Eagle-Picher Lead Company, for the benefit of itself and its codefendant, the Commonwealth Lead and Zinc Company, while in possession of the premises and while operating the mines under the sublease and accounting to plaintiffs for royalties accruing under the sublease, took and obtained from A. L. Wilbur, the landowner, a mining lease on said property for the purpose of mining lead and zinc ores therefrom, which was to commence on April 18, 1932, the day on which the prior lease from the landowner terminated, and to run for a period of fifteen years from April 18, 1932, providing for the payment of 12½ per cent royalty, being the same amount of royalty as under the prior lease except under the prior lease it was divided, 10 per cent going to Wilbur and 2½ per cent to the plaintiffs.

The appellants, in presenting their theory of the case and the authorities in support thereof, outline and forcibly urge three propositions of law as involved therein, viz.:

"I. Appellants, as lessees under the original lease, were possessed of an expectancy of renewal constituting a vested property right which equity will protect against all persons in a fiduciary or quasi-fiduciary relationship

with appellants, although such expectancy constitutes, as against appellants' lessor, no enforceable legal right.

"II. A fiduciary or quasi-fiduciary relationship existed between appellants and appellees under the terms and incidents of the sublease, the sole rentals thereunder being royalties upon ore produced, since: (1) Appellees were interested for and with appellants in the subject of the lease, both in accounting for royalties and in the eventual division of ore produced or the proceeds thereof; (2) appellees, under the terms and incidents of the sublease, became the agents of appellants; and (3) appellees, through such sublease, became possessed of secret and confidential information, superior to that possessed by appellants, and appellants, as a result, were necessarily compelled to repose trust and confidence in appellees and their integrity, fidelity and good faith, inevitably relying upon them not to use such confidential information so obtained for purposes antagonistic to or destructive of appellants' rights.

"III. Such fiduciary or quasi-fiduciary relationship existing, appellees were in equity prohibited from acquiring, by the renewal of appellants' original lease under which appellees were appellants' subtenants, rights in the property antagonistic to the rights of appellants and destructive of appellants' expectancy of renewal; appellees having obtained such renewal with the consequent destruction of appellants' expectancy, such renewal inures in equity to the benefit of appellants; and a constructive or implied trust will be imposed thereon for the use and benefit of appellants."

As to the first proposition, stating a rule to which appellants have very properly made the exception of its not being enforceable against the landlord, we think further exceptions or modifications are necessary, unless they are impliedly embodied in the word "expectancy" which is a "contingency as to possession, that which is expected or hoped for" (Bouvier's Law Dictionary). At most it is a mere hope or expectation, contingent upon the will and pleasure of the landowner, and hardly reaches the height of a property right, much less a vested right, because where there is no obligation there is no right. It is a possibility for which a party may, under certain circumstances, properly hope. (Words and Phrases; *Robinson v. Jewett*, 116 N. Y. 40.) The principle urged by appellants seems to have arisen "in case of church leases, . . . where there is but a slight probability of the renewal being refused, if the tenant consents to pay the renewal fine, or the increased rent which the landlord may think proper to require." (16 R. C. L. 903.)

This further and necessary exception to the rule announced is where the reasonable probability that the landowner will consider a renewal is lacking. The record here shows the landowner was receiving a royalty of 10 per cent under the old lease and Robinson

2½ per cent, and when the landowner filled in the royalty in the new lease as 12½ per cent the testimony shows he said he would just make the lease himself and take the extra royalty himself.

What was the reasonable probability, expectation or hope of a renewal on the old basis through the sublessor, as against a 25 per cent increase in royalty by dealing directly with the tenant in possession?

"This has been deemed a species of property in the lessee, and a copartner or one standing in any fiduciary capacity is not permitted to profit by taking a renewal in his own name while this expectancy exists. But the rule ceases to operate when such expectancy no longer exists. It will hardly be claimed that a landlord may not exercise his own discretion in the selection of a tenant. He may or may not renew, as he chooses. When once he has declared against renewal, the tenant, then in occupation, has no more an expectancy which can be dealt with." (*Crittenden & Cowler Co. v. Cowler,* 72 N. Y. Supp. 701, 702.)

Another exception to the rule is the necessity of there being a fiduciary or confidential relation existing between the parties. The statement of the principle under consideration, as given in 16 R. C. L. 903, cited by appellants, is immediately followed by the requirement of such relationship in the application of the rule.

In the note of 7 A. & E. Ann. Cas. 296, cited in the last authority above mentioned, it is stated that fiduciary duty and breach thereof is essential to the application of this rule, and where the elements of fiduciary relationship and concealment or bad faith are lacking the rule has no application. The appellants recognize this necessity in their pleading these elements in this case, and so do most of the cases cited by appellants on this branch of the case, either directly or indirectly. One of them, *M'Court v. Singers-Bigger,* 145 Fed. 103, is as follows:

"A tenant under a lease, while having no absolute right to a renewal as against the landlord, in the absence of provision therefor, has a reasonable expectancy of renewal which is regarded in equity as property, and, if one standing in a fiduciary relation to him secures a renewal to himself, a court of equity will treat him as holding the new lease in trust for the original lessee." (Syl. ¶ 2.)

Other cases cited show the relationship of the parties as partners, principal and agent, managing director and board of directors, trustee and *cestui que trust* and guardian and ward. Where such a confidential duty is owing from one to the other and has been breached, the rule is applicable.

We cannot accept the first announced principle as complete in itself without at least the further exceptions of its being inapplicable where there is no reasonable probability, hope or expectation and the necessity of the existence of a fiduciary relationship and a breach thereof. This last feature is involved in the two remaining propositions maintained by the appellants, which will be considered together.

Appellants do not assert that every lease creates a fiduciary relationship, but insist that the mutual interest of the parties in the mining enterprise, the accounting for royalties and the division of products or the proceeds thereof placed them in that relation and imposed a confidential duty on the sublessees toward the sublessors, and that this close relationship in effect made the sublessees agents of the sublessors. Further, the possession of business secrets and confidential information by the tenants superior to that of the sublessors resulted in a trust requiring an unusual degree of integrity, fidelity and confidence between them in order to promote their mutual interests and avoid antagonistic and destructive results.

We think the safer starting point is in recognition of the rule that generally and under ordinary circumstances a lease does not create a fiduciary relationship, but such relationship is created by contract or special facts and circumstances which go further toward imposing a confidential duty than the usual relationship of landlord and tenant.

"The doctrine of implied trusts arising out of renewals applies to fiduciaries of practically every description. . . . In order, however, that the doctrine may apply, there must exist some fiduciary relation between the person taking the new lease and the person claiming the benefit thereof; where the elements of fiduciary relationship and concealment or bad faith are lacking, the rule has no application. Thus, where an undertenant took a new lease from the original landlord without advising his own immediate landlord the doctrine was held inapplicable, there being no fiduciary relation." (16 R. C. L. 904, 905. See *Maunsell v. O'Brien,* 1 Jones' Rep. [Irish], 176, 185.)

This relationship has recently been defined as follows:

"A fiduciary relation does not depend upon some technical relation created by, or defined in, law. It may exist under a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence." (*Lindholm v. Nelson,* 125 Kan. 223, syl. ¶ 3, 264 Pac. 50.)

It has been held in this state that a tenant not under any duty or obligation to pay taxes on rented land may purchase the land at tax sale and acquire an adverse title against his former landlord. (*Weichselbaum v. Curlett*, 20 Kan. 709; *Smith v. Newman*, 62 Kan. 318, 62 Pac. 1011.)

The decisions in cases relating to partners, agents, trustees, guardians, executors, business managers and the like afford us very little help in arriving at a conclusion as to the existence of a fiduciary relationship between sublessor and sublessee in a mining lease. The names and terms themselves express a confidential relationship which is neither expressed nor implied in that of landlord and tenant.

*Matthews' Appeal*, found in 104 Pa. 444, is cited as sustaining the contention of appellants, and it does, but it is a very unusual and peculiar case where the tenant held a mortgage lien on the property rented and within four or five days after going into possession commenced an action to recover a judgment on it, which the court held was proper, but later sold the property and purchased it at sheriff's sale, without notice to the landlord, for an inconsiderable amount compared with the value of the property, when the lease provided that the rent should be applied on the mortgage lien, the lease being taken as an adjustment of legal difficulties between them and an apparent "suspension of hostilities." The court spoke of the case as quite unusual and out of the ordinary relation of landlord and tenant, citing no precedents. It does not appear that this case has been followed in Pennsylvania, and where cited with others in 53 L. R. A. 934, the editor says in the note:

"The great weight of authority, however, denies the existence of any such disqualifying relation, and establishes the proposition that a tenant, or one claiming under him, may, if he acts fairly, acquire the title that the landlord held at the commencement of the tenancy by purchase at a judicial sale or from one who holds under such a purchase." (p. 937.)

The case of *Phyfe v. Wardell & Woolley*, 5 Paige's Ch. Rep. (N. Y.) 268, was a lease made by a church under a recognized custom of a right of renewal, where the tenant sold and assigned his lease and right of renewal with a positive oral agreement that it was subject to a lease to a subtenant on a part of the property, which was breached as to the subtenant involving the original tenant. The court held that the renewal lease thus obtained by the defendants inured to the benefit of the original tenant, because of the

fraud and unconscionable advantage taken by the defendants of their legal rights.

Another case cited is *Holridge v. Gillespie*, 2 Johns. Ch. Rep. 29, where a farm tenant assigned his lease running eight years longer to his creditor as security for his indebtedness and later entered into an agreement with him to let him into possession of one-half of the premises for a certain consideration which was never paid. The creditor surrendered the lease to the landowner and took out a new lease in the name of a friend, and the court held that the original tenant under such circumstances should have the benefit of the renewal lease upon paying his indebtedness to his creditor.

In the case of *Wunderlich v. Reis*, 31 Hun 1 (N. Y.), under a recognized custom of renewal and removal of improvements, the tenant for a term of twenty-two years assigned the lease and the assignee then mortgaged the improvements, and then took out a renewal lease without surrendering the old lease, then assigned the old lease. Under these confused circumstances the court held that the mortgagee was entitled to the benefit of the renewal lease.

The case of *Weible's Appeal*, 127 Pa. St. 34, was where an oil and gas lease was made to partners and because of discontinuance of operations a new lease was issued to an agent of one of the original partners, and the finding of fiduciary relations was on account of the existence of a partnership and an agency.

The case of *Sperry v. Collieries Co.*, 87 W. Va. 223, concerned a mining lease, but instead of being an action to declare a trust was an action to cancel the lease and have an accounting as to amount of royalties due and unpaid by the lessee. It was there held that failure of the lessee to keep and render correct accounts was a breach of duty, and since his contract required him to keep such accounts he was to that extent the agent of the lessor.

The case of *Dunfee v. Terwilliger*, 15 F. (2d) 523 (Nev.), is quite like the instant case in that it is a mining case and involves the issuance of a renewal lease, but the renewal was not until after the original lease had terminated. It was there held that the taking of the new lease by one of the stockholders after they had abandoned the lease for eighteen months did not inure to the benefit of the stockholders.

In Missouri the statute requires a certain registration by lessees in the operation of mines, and in case of a failure to do so the lease will

terminate in three years, and it was held in *Robinson v. The Troup Mining Co.*, 55 Mo. App. 662:

"Where the landlord on leasing mining lots fails to post the notices required by section 7034, Revised Statutes, 1889, the lease will expire at the close of three years, and the subtenant who, during the currency of the three years, bought the landlord's title will take the same at the expiration of that time, free from the prior claim of the first tenant.

"A tenant may not dispute his landlord's title at the commencement of the term, but may show that his interest has terminated by the efflux of time, and the fact that, by inadvertence or mistake of his rights, he may have paid rent for the expiration of leasehold, will not be construed into a continuance of the tenancy." (Syl. ¶¶ 1, 2.)

This view of the law was maintained and approved in a later decision, as follows:

"Where a lessee of mining land plats it and posts rules omitting to name the time for the continuance of miner's rights to operate as required by the statute, then the license continues for a period of three years and no longer and the licensee after that period may take a new license from the owner of the fee." (*Ashcraft v. Englewood Mining Co.*, 106 Mo. App. 627, syl.)

In the case of *Goocey v. Hopkins*, 206 Ky. 176, concerning an oil lease, it was held:

"Original lessee being under no obligation to renew or extend lease, his assignee was under none, unless made so by terms of assignment . . ." (Syl.)

The facts in the case of *Hawkins v. Klein*, 124 Okla. 161, are almost identical with those in the instant case and therefore deserve to be stated somewhat at length. Dawes was the owner of mining property in Oklahoma and leased it to Moses on May 16, 1916, for a term of ten years, providing for a royalty of 7½ per cent. This lease, by subsequent transfers and assignments, came into the hands of one Klein, who executed a lease on the same to Hawkins for the term ending October 21, 1925, a few months prior to the termination of the Moses lease, providing for a 15 per cent royalty. At two different dates in July and August, 1920, the heirs of Dawes executed a lease to Hawkins to terminate July 23, 1930, with a royalty of 10 per cent. Klein brought an action asking the court to declare a trust in him and his associates under the original Moses lease as to the renewal or extension lease made directly to Hawkins while Hawkins was in possession and operating under the lease from Klein, and the court held:

"Where the only relationship of H. to K. and associates was that of sub-lessee under them, and while in such relationship H. acquired additional rights

in the property from the owners, held, that H. was not the confidential agent of K. and associates; and further held, that any such additional rights acquired by H. do not inure to the benefit of K. and associates." (Syl. ¶ 3.)

Because the following clause was in the original lease a different conclusion was reached in another recent Oklahoma case under very similar circumstances:

"This reservation shall likewise apply as to all modifications, renewals of such lease, or extensions that the assignee, his successors, or assigns may secure." (*Probst v. Hughes*, 143 Okla. 11, 12.)

From these and other authorities we are unable to conclude that there exists a fiduciary relationship between a tenant and his landlord even where it involves a mining lease, but do conclude that such a tenant does not ordinarily occupy a fiduciary relationship with his landlord. A sublessee may properly deal with his sublessor at arm's length in his sublease contract and owes him the duty to perform the obligations imposed upon him by the sublease, and no more.

Neither do we think the pleadings and evidence in this case show the defendants to have been the agents of the plaintiffs nor to have violated any obligation imposed by their contractual relationship so as to constitute a breach thereof.

Comparing the mining lease involved in this action with the usual city or farm lease, we find that it exhibits less concern on the part of the lessor than does the ordinary lease. It does not prohibit the subleasing nor assigning of the lease without written consent as most others do. Plaintiff Robinson testified when he executed the lease to Klingenberg, trustee, that Klingenberg "was making a deal with some other people. I don't know who was in the deal at that time." Evidently the personnel of the sublessee or operator was of very little or no concern, which naturally removes them farther from a confidential relationship. He made the sublease to Klingenberg, trustee, for $32,500 bonus and a royalty. The lease provides that the sublessee, his successor and assigns shall keep a correct account of all minerals mined, to whom sold and the price received therefor, and then provides that the books and accounts shall be open for inspection of the sublessor and his agents, which is not the ordinary language used in establishing an agency or reposing special confidence in one to act with him.

It is contended that the payment of royalties made the sublessor and the sublessee mutually interested. There is always the intention

that they be mutually interested in the successful results; but with the authority in the lessor to compel the constant operation of the mine regardless of the loss to the operator in doing so, there is a wide departure from mutuality of interest for such time as that condition exists.

Counsel for appellants invoke the rule based upon the sound public policy that for the purpose of removing all temptation, all possibility that a trustee may derive profit from any subject matter of his trust by a betrayal thereof should be removed, as is forcibly stated in the opinion in the case of *Trice v. Comstock*, 121 Fed. 620. The court first found there existed a fiduciary relationship, a confidential agency, and then such wholesome regulations and sound public policy were particularly applicable, but where the dealings are at arm's length and without any agency or trust involved or special confidence reposed, we have not observed the application of this rule.

We conclude that the trial court committed no error in refusing to impose a trust upon the renewal lease for the use and benefit of the plaintiffs.

The judgment is affirmed.

SLOAN, J., not participating.